UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-cv-26109-ALTMAN/Hernandez

JOEL RODRIGUEZ, *individually and derivatively on behalf of*
PINECREST BAKERY, LLC,

    *Plaintiff*,

v.

EFRAIN VALDES, JR., *et al.*,

    *Defendants*.

_____/

## ORDER

Three shareholders own a chain of bakeries. One shareholder, purporting to serve as the company's manager, terminated—and then sued—the other two shareholders. Those terminated shareholders now move for a preliminary injunction, seeking reinstatement. After careful review, we **DENY** the motion.

### THE FACTS

Pinecrest Bakery, LLC (the "Bakery" or the "Company")—"a Florida limited liability company" formed in "2012," Second Amended Complaint (the "SAC") [ECF No. 129] ¶¶ 9, 41—"operates twenty-five corporate store locations and additional franchised locations throughout South Florida," Amended Expedited Motion for Preliminary Injunction (the "Motion") [ECF No. 63] at 2. Three members own the Bakery: (1) the Plaintiff Joel Rodriguez, "a co-founder and 50% shareholder"; (2) the Defendant Efrain Valdes, Jr. ("Efrain"), "a co-founder and 25% shareholder"; and (3) the Defendant Glady Valdes ("Gladys"), a "25% shareholder" and Efrain's "wife." SAC ¶¶ 2–4, 9.

According to the Plaintiff, Efrain and Gladys (together, the "Valdeses") "maintained control over all Company bank accounts and financial operations" "[f]rom day one of the business in 2012

and up until the entry of [an] in-house accountant in mid-2022." *Id.* ¶ 41. But "during the first quarter of 2022," our Plaintiff grew "[s]uspicious of [Efrain's] conduct" and "took matters into his own hands" by removing "from [Efrain] the control that [he] had (since 2012) over the company's finances, books[,] and bank accounts." *Id.* ¶ 35. "In approximately March or April 2022 (and over Valdes's objection), Rodriguez hired an in-house accountant who, over time, assumed control of the company's finances." *Id.* ¶ 36. The Valdeses deem the Plaintiff's "extreme and wrongful actions to avoid and manipulate Florida law" a "thinly-veiled attempt to steal the Company." Motion at 2, 4.

"[I]n late 2025," the Plaintiff—purporting to act as "sole Manager" of the Bakery—"made the decision to terminate the Valdeses from their employment at the Company." *Id.* ¶ 125; *see also id.* ¶ 127 ("Rodriguez also hired . . . Greenberg Traurig . . . to represent and protect the [C]ompany's interests and, on December 26, 2025, the Company's attorneys sent letters to the Valdeses advising them their employment with the Company had been terminated because of their misconduct, that they were to return any Company property to the Company, and that, as terminated employees, they were not permitted to access Company premises."). And, on December 27, 2025, the Plaintiff—individually *and* (purportedly) on behalf of the Company[1]—sued the Valdeses, alleging that they "secretly stole and diverted millions from Pinecrest Bakery, to the detriment of the Company and its other shareholder, Rodriguez." Complaint [ECF No. 1] ¶ 38; *see also id.* ¶ 39 ("While the full scope of the Valdeses' theft, fraud, embezzlement and violations of law is yet to be discovered, based on currently available information, it is evident that the Valdeses stole and converted over $20 million in company funds[.]"

---

[1] In bringing *derivative* claims, the Plaintiff names as Nominal Defendants the Bakery itself and two-dozen limited-liability companies within the Bakery's umbrella. *See* Complaint [ECF No. 1]. As noted below, *see supra* at 19 & n.9, two competing law firms—Greenberg Traurig, LLP ("Greenberg Traurig") and Nelson Mullins Riley & Scarborough, LLP ("Nelson Mullins")—each claim to *exclusively* represent the Nominal Defendants. Acting through Greenberg Traurig, the Nominal Defendants filed crossclaims against the Valdeses (and other companies allegedly owned and controlled by the Valdeses) on the same day that the Plaintiff sued the Valdeses. *See* Answer and Crossclaim [ECF No. 38]; *see also* Amended Crossclaim [ECF No. 138].

(emphasis omitted)); *but see* Motion at 6 ("Rodriguez himself signed *in person* on the signatory cards on the 'secret' accounts of which he complains[.]"); *id.* at 7 ("[T]here are glaring issues with the manager declarations," as "[a]lmost every single manager [ ] reads in Spanish, not in English.").

On January 22, 2026, the Valdeses moved—on an expedited basis—for a preliminary injunction "to prevent [the] Plaintiff's improper and unauthorized attempt to hijack [the Company] and his actions in locking out co-owners Efrain . . . and Gladys[.]" Expedited Motion for Preliminary Injunction [ECF No. 17] at 1. But after the Plaintiff amended his complaint on January 26, 2026, *see* First Amended Complaint (the "FAC") [ECF No. 18],[2] we denied as moot that preliminary-injunction motion, *see* Paperless Order [ECF No. 31].

On February 27, 2026, the Valdeses filed an Answer and Counterclaim [ECF No. 57], asserting nine counts against the Plaintiff—two of which prove relevant here. *First*, they claim that the Plaintiff "materially breached" the Bakery's 2014 Operating Agreement (the "OA") [ECF No. 57-2] by "attempting to act as the Company's Manager without authorization," "usurping control of the management of the business and affairs of the [C]ompany," "preventing the Valdeses from management and participation in the Company," and "directing his attorneys to send 'termination letters'" and "interfere with business relationships [Count I]." Answer and Counterclaim ¶ 89. *Second*, they contend that the Plaintiff violated his "fiduciary duty of loyalty and care" by "knowingly and intentionally taking actions contrary to the Valdeses' and the Company's best interests and in furtherance of his own interests [Count IV]." *Id.* ¶¶ 114, 117.

---

[2] The FAC added two new Defendants: Flagler 1927, LLC and EV & GV Holdings, LLC—companies allegedly "owned and controlled" by the Valdeses. *See* FAC ¶ 1. And the SAC later added two more—8825 SW 120 ST, LLC, and 482 Bahia Ave, LLC. *See* SAC ¶¶ 7–8 (alleging that "the members" of those companies "are either one or both of the Valdeses"). But the *Valdeses*, not the *Defendants*, filed this Motion, so we'll refer to the movants as the "Valdeses."

On March 2, 2026, the Valdeses filed this Motion, asking (among other things) that we "[r]estore the Valdeses['] access to all accounts, software, and company space"; "restore and reaffirm Efrain . . . as the Company's sole Manager, as provided by the [OA]"; and "appoint a Custodian *Pendente Lite* . . . to help conduct an actual accounting and prevent Rodriguez from causing any further harm to the Valdeses as Members and parties to valid governing contracts, to their goodwill and reputations, interference with [Efrain's] fiduciary duty as Manager, as well to the Company and its reputation." Motion at 3. While the Valdeses believe they're "likely to prevail on the merits of several if not all of the Counterclaims, as well as of the claims brought against them," *id.* at 12, they focus their Motion on the two counts highlighted above: their breach-of-the-OA and breach-of-fiduciary-duty counterclaims.

As to the breach-of-the-OA counterclaim, the Valdeses argue that the OA—as the "current governing document" that "prevails . . . to the extent it conflicts with a record delivered to the Florida Department of State, Division of Corporations"—"clearly designates Efrain . . . as the Company's sole Manager" and "requires *unanimous consent* from the Company's Members to amend the [OA] and replace the Manager." *Id.* at 10. And as to the breach-of-fiduciary-duty counterclaim, they assert that the Plaintiff—while "acting as the Company's *de facto* Manager after his improper ousting of the Valdeses"—breached his "duty of loyalty and care to the Company and its Members" by "negligently performing the duties of Manager, including blocking the Company's co-owners' access to Company operations, needlessly initiating a lawsuit purportedly on the Company's behalf without satisfying procedural requirements for derivative actions, failing to investigate his suspicions about the Valdeses prior to upending over a decade of operations, and jeopardizing Company modernization projects." *Id.* at 11.[3]

---

[3] Meanwhile, on March 3, 2026, we issued our Order After Status Conference [ECF No. 68], which (among other things) appointed—on the parties' "agree[ment]"—"Mark S. Meland of Meland

On March 30, 2026, the Plaintiff filed a Response in Opposition to the Motion (the "Response I") [ECF No. 94], arguing that the Motion "fails for three independent reasons." Response I at 1. *First*, he contends that the Valdeses' "unclean hands bar the equitable relief requested," citing (among other things) "apparent misappropriation, forgeries, and fabrications in connection with" "a number of federal COVID-relief loans"; "intercept[ing], divert[ing], and embezzl[ing] . . . millions . . . from the bakeries"; and "post-termination actions to sabotage, hurt, and interfere with the Company." *Id.* at 2, 7, 11 (cleaned up). *Second*, the Plaintiff insists that the "central premise" of the Motion "is wrong" because, "[a]t the time of the termination in December 2025, Rodriguez was the Company's sole Manager, as confirmed by the Annual Statement filed with the Secretary of State on January 13, 2025." *Id.* at 15; *see also id.* at 16 (arguing that the OA "became irrelevant and obsolete years before 2025," and that the "true, operative operating agreement— which . . . may include any combination of records and oral or implied conduct—took on a different form over the years" (emphasis omitted)). *Third* and finally, the Plaintiff maintains that the Valdeses haven't shown a likelihood of success on their two counterclaims because "there is no 2014 Operating Agreement in effect that can be breached"; because "[t]here could be no clearer example of Rodriguez's fiduciary commitment to safeguarding the Company than his decision to bring this action on the Company's behalf against two actors (and their companies) who have defrauded the Company and the government, stolen millions from both, and engaged in other serious unlawful misconduct"; because the Valdeses face no irreparable harm; and because the public interest disfavors relief. *Id.* at 21.

---

Budwick, P.A., to serve as custodian of the Nominal Defendants and as an authorized signatory for the relevant bank accounts." *Id.* at 1. Later, on March 23, 2026, Meland filed a Motion to Clarify the Order Appointing the Custodian (the "Motion to Clarify") [ECF No. 84]. We address the Motion to Clarify later in this Order.

On April 6, 2026, the Defendants filed a Reply in Support of Motion (the "Reply I") [ECF No. 101]. On April 13, 2026, we referred the Motion to U.S. Magistrate Judge Yeney Hernandez. *See* Order of Referral [ECF No. 113].[4] And, on June 3, 2026, Magistrate Judge Hernandez issued a Report and Recommendation (the "R&R") [ECF No. 166], suggesting that we deny the Motion.

As a threshold matter, the R&R clarified that, of the Defendants' original requests, only two "remain live: (1) accessing Company operations and all resources necessary for Company management (including physical access to the Bakery's offices); and (2) restoring E[frain] as manager." R&R at 6. It also rejected the Plaintiff's unclean-hands argument, finding that the Plaintiff "identifies no case where *disputed* conduct barred the door to relief." *Id.* at 7. And, as to the heart of the Motion, the R&R determined that "the Valdeses cannot establish a substantial likelihood of success on the merits" and "have shown no irreparable harm." *Id.* at 4.

On June 17, 2026, the Valdeses challenged six aspects of the R&R. *First*, they assert that the R&R "erred by not recognizing the proper burden of persuasion applicable to addressing Rodriguez's unilateral change to the status quo." Objections to the R&R (the "Objections") [ECF No. 185] at 5. *Second*, they argue that the R&R "erred by determining that the Defendants had not established Efrain's right to Manager authority." *Id.* at 6. *Third*, they contend that the R&R "erred in stating that the Valdeses' request 'that they should have full access in order to be able to report to the Custodian things that Rodriguez may ask him to do that he would not otherwise know to be problematic' is

---

[4] On April 29, 2026, the Plaintiff filed the operative SAC. Still, the parties agreed that the Motion remained viable. *See* Plaintiff's Supplemental Brief [ECF No. 146] at 1–2 ("Plaintiff's filing of [the] . . . SAC . . . does not affect the Court's preliminary injunction analysis because the updates in the new complaint either (1) are already covered in the MPI record or (2) do[ ] not have an impact on the issues presented in the MPI."); Defendants' Supplemental Brief [ECF No. 147] at 2 ("Plaintiff's . . . SAC . . . changes nothing."). After the Defendants filed an Amended Counterclaim [ECF No. 153-1], the parties again declined to take the position that this amendment changed any "previously advanced arguments" concerning this Motion. Judge Hernandez Paperless Order [ECF No. 160]. And no party has argued that the *latest* Amended Counterclaim [ECF No. 212] affects this Motion at all.

already encompassed within the request for full access to Company operations." *Id.* at 10 (cleaned up). *Fourth*, they claim that the R&R "erroneously concluded that the Valdeses have not shown a likelihood of success for their request for access to the Company's management." *Id.* at 13. And *fifth* and *sixth*, the Valdeses maintain that the R&R erred in its irreparable-harm and public-interest analyses. *See id.* at 14–18.

On July 10, 2026, the Plaintiff filed his Response to the R&R Objections (the "Response II") [ECF No. 225], arguing that the Defendants established neither a substantial likelihood of success on the merits of their claims nor irreparable harm; that the balance of hardships and the public interest each favor the Plaintiff; and that "Mr. Meland . . . can [now] be discharged from his role." Response II at 16; *see also ante* at 4 n.3. The Motion is now ripe for adjudication.

## THE LAW

"A district court may grant a preliminary injunction only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). "A district court cannot grant a preliminary injunction unless the moving party satisfies all four of these requirements." *AccessNinja, Inc. v. PassNinja, Inc.*, 2026 WL 501948, at *2 (S.D. Fla. Feb. 24, 2026) (Altman, J.). Because "[a] preliminary injunction is an extraordinary and drastic remedy," the movant "bears the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (cleaned up).

## ANALYSIS

Under Local Magistrate Rule 4(b), parties have fourteen days from the date of being served with a copy of an R&R to file written objections with the relevant United States District Judge. *See also*

FED. R. CIV. P. 72(b)(3). After parties properly object to a magistrate judge's R&R, district courts must review that disposition *de novo. See ibid.* ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."). But, when no party has timely objected, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." FED. R. CIV. P. 72 advisory committee's notes (citation omitted). Although Rule 72 itself is silent on the standard of review, the Supreme Court has acknowledged that Congress's intent was to require *de novo* review only where objections have been properly filed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). In any event, the "[f]ailure to object to the magistrate's factual findings after notice precludes a later attack on these findings." *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988).

Here, the Valdeses filed objections to certain aspects of the R&R, and the Plaintiff responded to those objections. We'll thus proceed in four parts. *First*, we'll address two threshold items. *Second*, we'll examine whether the Valdeses have established a substantial likelihood of success on the merits of their two counterclaims. *Third*, we'll turn to the remaining elements of the preliminary-injunction calculus. And *fourth*, we'll consider our ruling's impact on the Motion to Clarify the Order Appointing the Custodian (the "Motion to Clarify") [ECF No. 84].

## I.    Preliminary Issues

We begin with two preliminary matters before reaching the merits of the Motion. *First*, the Valdeses claim that the R&R "erred by not recognizing the proper burden of persuasion," as they need "meet only the preponderance of the evidence standard, not the particularly heavy burden required of mandatory injunctions seeking to change the status quo." Objections at 5 (quotation marks omitted). But, as the Plaintiff observes, the Valdeses "*were* held to the lower standard of proof they

8

ask for." Response II at 3. After all, the R&R determined that "the Valdeses would not be entitled to a preliminary injunction even under the non-heightened burden requiring proof of all four elements by a preponderance of the evidence." R&R at 5. We therefore **OVERRULE** this objection and make clear that, in resolving the Motion, we too assume without deciding that the preponderance-of-the-evidence standard applies.

*Second*, the Plaintiff raised an unclean-hands argument. In his view, the "substantial evidence of unconscionable and unlawful conduct that directly relates to—and precipitates—[the] employment termination . . . bar[s] [the Valdeses] from obtaining the equitable relief they seek[.]" Response I at 2. The Magistrate Judge disagreed, finding that "the record before us is far from complete" and that "[i]t would be a disservice to this equitable principle to refuse to consider the merits of an argument because of alleged—and hotly disputed—wrongdoing without a more concrete evidentiary footing." R&R at 7.

The Plaintiff offers no objection to—and we see no clear error in—that portion of the R&R. "To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015); *see also Synovus Bank v. Sims*, 540 F. App'x 905, 907 (11th Cir. 2013) (noting that Florida law requires "unrighteous, unconscientious, or oppressive conduct" to trigger the unclean-hands doctrine). So, we agree with the Magistrate Judge that, at this early stage of the case, we can discern neither a direct relationship to the claim nor direct injury to the Plaintiff—let alone sufficiently egregious misconduct. We therefore proceed to the merits of the Motion.

### II.     The Likelihood of Success on the Merits

The R&R found that the Valdeses cannot establish a substantial likelihood of success on the merits of *either* the breach-of-the-OA *or* the breach-of-fiduciary-duty counterclaim. The Valdeses object to the former but not the latter. We examine each counterclaim below.

### a.  The Breach-of-the-OA Counterclaim

In finding that the Valdeses haven't established a substantial likelihood of success on the merits of their breach-of-the-OA claim, the R&R explained that the Motion operates under the assumption that, "once appointed manager, E[frain] remained manager indefinitely." R&R at 8. But that assumption, the R&R noted, disregards the explicit terms of the OA, which specifies that "'manager(s) shall be elected annually'" and serve only "'until the next annual member meeting,'" making "evidence regarding who was initially appointed manager . . . of limited value." *Id.* at 9 (emphasis omitted). And so, given that the preliminary-injunction record includes "meeting minutes from 2013[,] . . . 2014, and 2016, as well as 2021, but none from the annual meeting that was supposed to precede the so-called 'December Surprise,'" the R&R concluded that the Valdeses "offer inconclusive evidence of Pinecrest's management." *Id.* at 11; *see also ibid.* ("Because this is the Valdeses' Motion, and they shoulder the burden of persuasion, inconclusive evidence is fatal to their position.").

Resisting this conclusion, the Valdeses insist that the R&R "misinterpreted" both the OA and "Florida LLC law." Objections at 6. As they see it, the OA—which, under "Florida law," "controls" over "public-facing reports"—requires that, "in the absence" of an annual vote appointing a new manager, "the Company 'retain[ ] the person(s)' previously in that position." *Id.* at 7, 8. They thus believe that the OA "remains in effect," with Efrain installed as "manager under its terms and procedures," because "[t]here is no evidence of any annual vote naming anyone but Efrain as manager." *Id.* at 7, 9. And "[t]o the extent the OA was ambiguous on whether Efrain remained manager," the Valdeses argue that "the court should look to [Florida Statute] Chapter 605," *id.* at 9,

which provides that "[a] person chosen as a manager continues as a manager until a successor is chosen, unless the manager at an earlier time resigns, is removed, or dies or, in the case of a manager that is not an individual, terminates," FLA. STAT. § 605.04072(3).

The Plaintiff maintains that the OA "do[es] not support this conclusion." Response II at 4.[5] He first explains that the retainment provision on which the Valdeses rely "says nothing about how the Manager must be elected or how long is the term of each Manager." *Id.* at 5. The Plaintiff then insists that the Valdeses' interpretation of the OA is "contradicted" by provisions requiring that managers be "'elected annually,'" specifying that managers hold office "'until the first annual meeting of members,'" and establishing "a default to a majority in interest of the members." *Ibid.* (emphases omitted). Finally, he argues that "the Valdeses' own signed statements," "including one contemporaneously made under oath by Gladys . . . in 2025," "defeat their claim even under Chapter 605." *Id.* at 7 (emphases omitted).

We agree with the Magistrate Judge that the Valdeses—relying *exclusively* on the OA—fail to demonstrate a substantial likelihood of success on this first counterclaim. *See* R&R at 7–8 ("The Valdeses' breach of contract claim turns on whether E[frain] . . . is Pinecrest's manager. Their chief— indeed, their only—evidence on this point comes from the 2014 Operating Agreement, but the contract is far from dispositive."). In support of their theory, the Valdeses invoke the OA's preamble, which states that, "[i]n the event that the members determine not to manage PINECREST BAKERY, LLC, then and in that event, the within . . . Company *retains the person(s)* described in Article I[,] Section 4 as manager(s)." OA at 2 (emphasis added). But that provision means only that, because the Bakery

---

[5] We'll note that the Plaintiff first "reiterates its position" that the OA "became irrelevant and obsolete years before 2025, and has not been the governing operating agreement between the parties for many years." Response II at 3 n.4. Still, for the purpose of responding to the Objections "only and without waiving his position," the Plaintiff "assumes arguendo" that the OA "was still in force and applicable." *Id.* at 4 n.3.

opted to operate as a *manager*-managed (rather than a *member*-managed) company, Efrain served as manager *in 2014*.[6] It cannot be *overread* to mean that whoever the OA named as manager continually serves as manager or reassumes that position whenever a vacancy arises. *See Seritage SRC Fin., LLC v. Town Ctr. at Boca Raton Tr.*, 397 So. 3d 44, 46 (Fla. Dist. Ct. App. 2024) ("A court must interpret a contract in a manner that accords with reason and probability, endeavoring to avoid an absurd construction." (cleaned up)).

The Valdeses might've found a stronger argument by looking to the "ELECTION OF MANAGER(S)" page, which—in listing "Efrain" as the "person[] . . . nominated and unanimously elected manager[]"—specifies that the "manager was elected to serve until the first annual meeting of members (*and until a successor of each shall have been qualified and elected*) or until each manager's earlier resignation, removal from office or death or dissociation (if member)." OA at 21 (emphasis added). That provision lends *some* support to the theory that Efrain retained his position indefinitely, even through the present, if a "successor" was never "qualified and elected." *Ibid.* But the Valdeses never mount this argument. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). And, in any event, other aspects of the OA complicate any such argument.

For one, the OA's preamble stipulates that "[t]he term of this agreement as to retention of any manager(s) only shall expire at the annual meeting of members unless the manager(s) (and if said manager is a member, if said member becomes dissociated with the within limited liability company) or removed or otherwise cease serving as manager(s) and successors thereto are appointed/elected by the members." OA at 2 (errors in original). Similarly, Article IV, Section 2 states that "[e]ach person

---

[6] All parties agree that the Bakery is *manager*-managed. *See, e.g.*, Amended Answer and Counterclaim [ECF No. 212] at 5 (describing Efrain as "Manager of the Manager-Managed [] LLC"); Response I at 16 ("Pinecrest Bakery is a manager-managed LLC").

named in the Articles of Organization or Operating Agreement as a manager(s) will hold office until the first annual meeting of members, or until the manager(s)' earlier resignation, removal, death or dissociation (if also a member)"—*and* that, "[a]t the first annual meeting of members and at each annual meeting thereafter, the members will elect manager(s), if applicable to serve until the next annual member meeting, prior resignation removal or death." *Id.* at 7. Those provisions reinforce the theory that a manager serves a one-year term without a retainment default.

The OA also allows for revisions. Article 12 vests the "members of the company" with "[t]he power to adopt, alter, or repeal provisions of this operating agreement." *Id.* at 12. And Article 1, Section 10 states that "[a]ny action required or permitted by . . . this operating agreement . . . to be taken at any annual or special meeting of members may be taken without a meeting, without prior notice and without a voice, provided that the action is taken by the members constitute a majority in interest of members." *Id.* at 6 (errors in original). So, even under the Valdeses' reading, the OA cannot provide definitive proof that Efrain—by virtue of being elected to the role in 2014—remains the manager *today* because the OA permits both revision *and* management changes outside of annual meetings.

Article IV, Section 6—entitled "Vacancies"—further muddies the waters. It provides that "[a]ny vacancy occurring in the manager(s), if applicable will be filled by a majority in interest of members," and that "[a] manager so elected to fill a vacancy will hold office only until the next annual meeting of members." *Id.* at 7. At a minimum, that Section provides still more reason to believe that managers serve capped terms, that the Company selects a new manager each year, and that the incumbent *doesn't* retain power in the event of a vacancy.[7]

---

[7] An argument could be made that the term "vacancy" presupposes that the incumbent *isn't* available to serve, narrowing the import of Article IV, Section 6. And reading "vacancy" to encompass only the sudden unavailability of a current manager (as opposed to, say, the natural expiration of a one-year term) finds contextual support from two aspects of the Section. *One*, replacements serve

13

Finally, the signature page of the OA bears *three* signatures—one each for Efrain, Gladys, and the Plaintiff. *See* OA at 14. And each name has two titles: "MEMBER" *and* "MANAGER." *Ibid.* That discrepancy might amount to an oversight. It might also signal that all three members served as co-managers *before* 2014. But the Valdeses never address this question, and we (at a minimum) agree with the Plaintiff that this page renders the OA "internally inconsistent." Response I at 16; *see also ibid.* ("[A]lthough it purports to designate Valdes as the Manager, all three Members . . . signed the document as 'Managers' of the Company.").

Those countervailing factors leave us in agreement with the Magistrate Judge that the Valdeses—relying on *only* the OA—fail to establish a substantial likelihood of success on the merits of this first counterclaim. That's not to rule that Efrain *isn't* the current manager. Nor is it to confirm the charges against the Valdeses. To the contrary, we echo the Magistrate Judge's point that the "incomplete" record before us today teems with "unanswered questions and competing accusations."[8] R&R at 14. But what we *can* say, for the purpose of resolving this Motion, is that the OA—in allowing

---

"until the next annual meeting," suggesting the vacancy occurred prematurely, *after* the prior annual meeting. *Two*, the phrase "if applicable" contemplates a degree of *atypicality*, as a regularly-scheduled vacancy would *always* be "applicable." But neither party relies on this Section. And, in any event, this Section at best shows only that the OA cannot alone resolve the counterclaim.

[8] One such question is why the Plaintiff, not the *Company*, sued the Defendants. *See, e.g.*, Renewed Motion to Appoint Special Litigation Committee [ECF No. 220] at 2 n.2 ("If Rodriguez truly was . . . [the] Manager at the time he filed suit, he could have caused the [C]ompany to have done so in its own right, begging the question why he filed a derivative action."). Another question concerns the Plaintiff's view of the timeline. The Plaintiff maintains that, "[a]t the time of the termination in December 2025, [he] was the Company's sole Manager." Response I at 16. But he never clarifies when he believes his tenure began. He instead argues that "the reality of the day-to-day operations of the business . . . confirm[s] that Rodriguez . . . has been managing the Company's activities *for years*." *Id.* at 17 (cleaned up & emphasis added). And while the Plaintiff points to the 2017 Amendment to the Company's Articles of Organization [ECF No. 28-31] as evidence that Efrain "has not been the Manager since at least 2017," Response I at 16 (cleaned up), he never argues that *he* took the mantle in 2017. So, while we cannot say that the Valdeses establish today that Efrain is the rightful manager, we likewise cannot say that the Plaintiff establishes that *he* is the rightful manager.

14

for change and giving managers expiring terms—cannot alone supply sufficient proof that Efrain is the current manager.

That brings us to the Valdeses' alternative argument. "To the extent the OA was ambiguous on whether Efrain remained manager," Objections at 9, the Valdeses direct us to Florida Statute § 605.04072(3), which provides that "[a] person chosen as a manager continues as a manager until a successor is chosen, unless the manager at an earlier time resigns, is removed, or dies or, in the case of a manager that is not an individual, terminates." FLA. STAT. § 605.04072(3). That background rule, they insist, means the Plaintiff improperly "seize[d] control of managership[.]" Objections at 10. But, for three reasons, we find § 605.04072(3) less helpful to the Valdeses' cause.

*First*, that a manager remains in power until "a successor is chosen" doesn't solve the factual question here, which is whether a successor displaced Efrain in the years since 2014. Having failed to put forward evidence on that front, the Valdeses cannot wield § 605.04072(3) as a tiebreaker, given that *they* carry the burden of persuasion. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites. The burden of persuasion in all of the four requirements is at all times upon the plaintiff." (quotation marks omitted)).

*Second*, even if the Valdeses are ultimately right that no successor was ever "chosen," their Motion doesn't account for Florida Statute § 605.04072(4), which provides that "[a] manager may be removed at any time without notice or cause by the consent of the member or members holding more than 50 percent of the then-current percentage or other interest in the profits of the limited liability company owned by all of its members." FLA. STAT. § 605.04072(4). So, even if § 605.04072(3) allows for the possibility that Efrain remains the manager today, § 605.04072(4) allows for the possibility that Efrain was removed from his post in the years that followed the OA.

15

To be sure, the Valdeses contend that, under the OA, "[t]he *only* method for removing a manager is by a meeting 'called expressly for that purpose' where removal is voted 'by a majority in interest of members.'" Objections at 10 (emphasis added). But while the OA states that, "[a]t a meeting of managers called expressly for that purpose, any manager(s) *may* be removed by a majority in interest of members," OA at 7 (emphasis added), it never says that such a meeting is the *only* method for removal. And, as the Plaintiff points out, at least two post-OA documents indicate that Efrain resigned *or* was removed. One such document—the 2025 Annual Report [ECF No. 28-29], filed with the Secretary of State and "prepared and certified under oath by Gladys"—"designates Plaintiff as the manager in 2025." Response II at 6 (emphasis omitted). The other—the 2017 Amendment to the Company's Articles of Organization [ECF No. 28-31], "signed and filed by Efrain"—designates Efrain as a member but *not* a manager. *Id.* at 6–7.

*Third*, still another provision of the Florida Statute—§ 605.04072(1)—allows for a manager to be "chosen at any time by the consent of the member or members holding more than 50 percent of the then-current percentage or other interest in the profits of the limited liability company owned by all of its members." FLA. STAT. § 605.04072(1). The Plaintiff thus argues that the 2025 Annual Report "evidences the necessary consent under § 605.04072(1) to choose Rodriguez as Manager in 2025," since the Plaintiff and Gladys together comprise "75% of the Company's membership." Response II at 6.

Given the above, we cannot say that the Valdeses have established a substantial likelihood of success on the merits of their breach-of-the-OA claim by relying on § 605.04072(3). That provision (it's true) suggests that a manager elected in 2014 *could* indefinitely maintain power. But that fact isn't itself evidence that a successor never replaced Efrain, especially considering that Florida law allows for a manager to be removed or chosen "at any time." The Valdeses' alternative argument therefore fares no better.

16

\*   \*   \*

"Preliminary injunction motions are often, by necessity, litigated on an undeveloped record." *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000). But "an undeveloped record . . . makes it harder for a plaintiff to meet his burden of proof[.]" *Ibid.* So too here. On the record before us, we cannot say whether Efrain, the Plaintiff, or someone else is the rightful manager. And that stalemate dooms the Motion, since the Valdeses—by dint of seeking injunctive relief—bear the burden of persuasion. We therefore **OVERRULE** their objections to the R&R's finding as to the breach-of-the-OA claim.

### b.   The Breach-of-Fiduciary-Duty Counterclaim

The R&R next found that the Valdeses fail to establish a substantial likelihood of success on the merits of their breach-of-fiduciary-duty counterclaim. *See* R&R at 11–16. We review that finding only for clear error, since the Valdeses never object to this portion of the R&R. *See generally* Objections; *see also* Response II at 7 ("Tellingly, Defendants did not object to the Magistrate Judge's findings on this issue and the Court need not make a de novo determination on it."). And, after careful review of the R&R, the record, and the applicable law, we find no such error.

"[T]o establish a breach of fiduciary duty under Florida law, a plaintiff must prove three elements: the existence of a fiduciary duty, a breach of that duty, and that the plaintiff's damages were proximately caused by the breach." *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 989 (11th Cir. 2020). The R&R assumed that the Valdeses satisfy the first element, since the Plaintiff "concedes that he owes a fiduciary duty to the Company," but determined that the Valdeses *haven't* met the second or third elements. R&R at 12. As to the breach-of-duty requirement, the Magistrate Judge noted that she "cannot say with any degree of confidence that the Valdeses will show [the Plaintiff's] actions were unwarranted," since they haven't "identified which loans their transfers allegedly repaid" and "have failed to address many of the[ ] allegations" concerning the "theft and misuse of company credit cards." *Id.* at 14–15. And, as to the damages requirement, the R&R found that the "harm

17

resulting from the breach . . . remains unsettled," since the Valdeses—relying solely on "their own affidavits"—neither "identify [any] modernization projects that have been stalled" nor "supply evidence of operational disruptions." *Id.* at 15 (quotation marks omitted); *see also id.* at 15 n.10 (noting that "[t]his failure also extends to their irreparable harm argument, where they supply only speculative harm").

We see no clear error in that analysis. "Corporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation." *Cohen v. Hattaway*, 595 So. 2d 105, 107 (Fla. Dist. Ct. App. 1992). Given the Valdeses' failure to address "many," R&R at 15, of the allegations of misconduct levelled against them and to explain—let alone furnish evidence of—the damages they describe, we cannot say that the Valdeses adequately show that the Plaintiff acted in bad faith, in disregard of the Bakery's best interest, and without diligence.

That's not to substantiate the allegations against the Valdeses. As we emphasized earlier, the record before us remains murky. So, we find only that the R&R didn't commit clear error in determining that the Valdeses cannot demonstrate a substantial likelihood of success on the merits of their second counterclaim.

## III.   The Remaining Preliminary-Injunction Elements

Finally, the Valdeses challenge the R&R's irreparable-harm and public-interest findings. *See* Objections at 14–18. But we needn't reach any of these arguments because the Valdeses haven't demonstrated a likelihood of success on the merits of either counterclaim. "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel*, 234 F.3d at 1176 (cleaned up). And since the Valdeses haven't met their burden as to the first element, we've no need to pass on the remaining three. *See Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281

(11th Cir. 2020) (Pryor, C.J.) ("We can begin and end with the first requirement. Because the minor parties failed to establish a substantial likelihood of success on their claims, the district court correctly denied their motion for a preliminary injunction.").

### IV.      The Motion to Clarify

Having found that the Valdeses fail to carry their preliminary-injunction burden, we now turn to the Motion to Clarify. *See ante* at 4 n.3. That motion details "disputes" between the Plaintiff and the Defendants "over the management of [the] Bakery . . . that threaten the smooth operation of the businesses," as well as "contrary interpretations" of our decision to appoint Mr. Meland. Motion to Clarify at 3. In light of these disputes, the motion seeks clarification as to whether Meland wields certain "powers," including the ability to "[r]esolve disputes business decisions beyond merely reviewing operations and approving payments," "[o]btain view access to Pinecrest Bakery's R365 account," "[h]ire a neutral company to conduct a valuation of the Nominal Defendants," and serve as a "Special Litigation Committee to investigate the derivative claims asserted by the parties in this case." *Id.* at 6–7.

The Defendants support the Motion to Clarify. *See* Corrected Response in Support of the Motion to Clarify [ECF No. 108]. Greenberg Traurig, LLP—purporting to act on behalf of the Nominal Defendants—filed a response opposing it. *See* Response to Motion to Clarify [ECF No. 99].[9] So did the Plaintiff, arguing that "the need for Mr. Meland's involvement will come to an end once the Court rules on the Valdeses' Motion for Preliminary Injunction." Response in Opposition to the Motion for Clarification [ECF No. 100] at 1. As the Plaintiff sees it, "after the [Motion] is resolved,

---

[9] Nelson Mullins, *also* purporting to represent the Nominal Defendants, "opted not to weigh in on the Motion to Clarify," but later "fe[lt] compelled to respond[.]" Motion to Appoint Special Litigation Committee at 5; *see also ibid.* ("If GT will not represent Pinecrest Bakery's interests independent of Rodriguez['s] influence (as it has repeatedly proven), undersigned counsel will and does so here.").

either Rodriguez or [Efrain] will be running the Company, with the authority the law permits for them to do so, and there will be no need for Mr. Meland to continue to be involved in this case." *Id.* at 13.[10] We agree with the Plaintiff.

On March 2, 2026, we held a hearing to address (among other things) an alleged "emergency"—a bank's decision to freeze "all of the Pinecrest Bakery Store accounts based on the existing conflicts over control and ownership of the accounts and the use of the funds that flow through those accounts." Emergency Motion [ECF No. 56] at 2–3; *see also id.* at 4 ("The business's current pay period ends tomorrow, February 28, 2026. Hundreds of employees (and presumably their families) are expected to be paid their salaries or wages this coming Wednesday. To effectuate [the] same, payroll figures must be entered into the system no later than close of business on Monday, March 2, 2026[.]" (citations omitted)). At that hearing, "[t]he parties agreed to appoint Mark S. Meland of Meland Budwick, P.A., to serve as custodian of the Nominal Defendants and as an authorized signatory for the relevant bank accounts." Order After Status Conference [ECF No. 68] at 1.

The parties wanted Meland appointed to "fix the bank account problem"—*i.e.*, "to get people paid, bank accounts unfrozen, all the rest." March 2, 2026 Transcript (the "Transcript") [ECF No. 99-1] at 38, 43; *see also id.* at 25 ("I want to make sure that when five o'clock today comes, there's payroll to be paid, and health insurance to be provided, and FPL bills to be paid, and all the rest."); *id.* at 33 ("[F]or now, we need to tell the bank that we've got somebody who can be the objective person, that

---

[10] That argument recycles the Plaintiff's response to the claim that the R&R erred by not considering the Valdeses' inability to advise Meland. *See* Objections at 10 ("[E]ven if the Court were to adopt the . . . recommendation against restoring . . . access necessary for Company management, the Court could still—in light of the Custodian's appointment—grant the Valdeses sufficient access in order to be able to report to the Custodian things that Rodriguez may ask him to do that he would not otherwise know to be problematic." (cleaned up)). There, as here, the Plaintiff insists that "the Valdeses will not end up needing the access they seek to advise the 'custodian' . . . because . . . the need for Mr. Meland's involvement will come to an end" "should the Court adopt Judge Hernandez's R[&R]." Response II at 15.

person will work with both parties . . . . Let's have Mark come in, meet with [Efrain], meet with Rodriguez, do what he thinks is right for the company so that the bank can unfreeze the account, pay people tomorrow[.]"). That appointment, in other words, reflected the need to resolve the bank-specific emergency so that "we [could] move on with a proper litigation about who actually owns the company, Rodriguez or Valdes." *Ibid.*

The Plaintiff represents that the aforementioned "crisis" has "been resolved," given that the "bank accounts are unfrozen" and, "with limited exceptions, employees, vendors, and suppliers are being paid." Response II at 15. For their part, the Valdeses haven't supplied competing evidence on this issue. And we agree with the Plaintiff's broader point that, with the Motion now resolved, "[t]he threat that precipitated the need for Mr. Meland's involvement will be fully resolved." *Id.* at 16; *see also id.* at 15–16 ("Should the Court adopt the R[&R,] . . . Rodriguez will be instructing the bank to remove the Valdeses from signatory authority on the Company bank accounts, removing their ability to make transfers of Company funds."). So, given our holding that the Motion fails, we see no reason to keep Meland in his current role.

That's not to rule out any future need for a third-party intermediary. *See* Renewed Motion to Appoint Special Litigation Committee [ECF No. 220]. Nor is it—despite the Plaintiff's framing—final confirmation that "the Valdeses' termination should stand and that [Efrain] is not to occupy the manager role at the Company[.]" Response II at 15. Those questions, as we made clear above, will need to be resolved at some later stage of the case. Our decision today merely reflects our commitment to "not putting our fingers on the scales" and to "keeping the status quo until further notice." Transcript at 40; *see also id.* at 24 ("I want to do as little as possible on the merits, right? I want to put

my finger on the scale as little as possible because I don't know any of the things that you're saying are true."). We therefore **DENY as moot** the Motion to Clarify.[11]

CONCLUSION

After careful review, in sum, we **ORDER and ADJUDGE** as follows:

1.  The Report and Recommendation [ECF No. 166] is **ACCEPTED and ADOPTED** in full.

2.  The Valdeses' Objections to the R&R [ECF No. 185] are **OVERRULED**.

3.  The Valdeses' Amended Expedited Motion for Preliminary Injunction [ECF No. 63] is **DENIED**.

4.  The Motion to Clarify the Order Appointing the Custodian [ECF No. 84] is **DENIED as moot**.

5.  The Plaintiff must file his response to the Renewed Motion to Appoint Special Litigation Committee [ECF No. 220] within **ten days** of this Order. *See* July 20, 2026 Paperless Order [ECF No. 231].

---

[11] The Valdeses' third and fourth R&R objections concern their access to Meland. *See* Objections at 10 ("[T]he Court could still—in light of the Custodian's appointment—grant the Valdeses sufficient access in order to be able to report to the Custodian things that Rodriguez may ask him to do that he would not otherwise know to be problematic."); *id.* at 12 ("Without equal access, Defendants are unable to fulfill this Court's intention of equal ability to advise the Custodian."). We can therefore **OVERRULE as moot** those objections to the R&R.

**DONE AND ORDERED** in the Southern District of Florida on August 12, 2026.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**